## KENNEDY v. LONABAUGH.

### (No. 659.)

PUBLIC LANDS—COAL LANDS—PARTNERSHIP—ILLEGAL AGREEMENT—
EQUITY—ACCOUNTING.

1. An agreement to acquire title to coal lands of the United States indirectly when it cannot be acquired directly constitutes an attempted fraud, and if the apparent title is so procured it constitutes fraud.

2. A contract whereby a partnership is formed for the purpose of acquiring control of coal lands of the United States in violation of the laws governing the entry and purchase of such lands constitutes a conspiracy to defraud the United States of its title, and any act in furtherance thereof would constitute a criminal conspiracy within the meaning of Section 5440, U. S. Revised Statutes.

3. A partnership was formed for the purpose of acquiring control and disposing of certain coal lands of the United

States, and also a tract privately owned. *Held,* that the contract of partnership being illegal as to the public coal lands was illegal as a whole, since it was not severable as to the tract which it was lawful to acquire.

4. A court of equity will not lend its aid to an accounting and division of profits under a partnership contract which is contrary to public policy and illegal; and in such a case it is the duty of the court to determine the character of the contract, even though its illegality has not been raised by the pleadings.

5. Where there is a new and independent contract between the parties, which is itself legal and can be enforced without reference to the business under an original illegal contract, though it may relate to the same subject matter, an accounting may be had upon the new contract, if the facts justify it.

6. It is the duty of a court to sustain a contract or part of it whenever it can do so within the provisions of the law and good conscience.

7. Plaintiff and defendant entered into partnership for the purpose of acquiring public coal lands of the United States, and interesting capital in the development thereof. Such lands were separately filed on by plaintiff and others, and he caused the same to be conveyed to parties who were to form a company to develop them, in consideration of $5,000 in money and 20,000 shares of the stock of the corporation to be formed. Prior to receiving the stock or money, he acknowledged in writing that he was indebted to the defendant for $2,500, for money loaned, and agreed to transfer 10,000 shares of said stock to defendant absolutely, and his remaining 10,000 shares as collateral security for the acknowledged loan. The defendant also received 50,000 shares from the company, which he claimed to have received as part compensation for his services as superintendent in opening up a mine on the lands. No money was in fact loaned to plaintiff by defendant, but the agreement reciting such loan was an attempted adjustment of the profits of the partnership enterprise. In a suit brought by plaintiff for an accounting for the 50,000 shares of stock issued to defendant, claiming that the same constituted a part of the partnership profits, the defendant filed a cross-bill claiming the right to recover the $2,500 from the plaintiff. *Held,* (1) that the partnership contract being illegal because against public policy and in violation of law, the plaintiff's action could not be main-

tained. (2) That defendant could not recover on his cross-bill, for the agreement acknowledging the indebtedness was not one collateral to the original contract that could be enforced independently of the latter, or based upon a new or independent consideration, but the consideration was a part of the profits of the illegal contract, and the alleged debt did not represent anything in plaintiff's hands, which in good conscience belonged to defendant.

[Decided October 6, 1911.]                    (117 Pac. 1079.)

ERROR to the District Court, Sheridan County; Hon. CARROLL H. PARMELEE, Judge.

The material facts are stated in the opinion.

*Enterline & LaFleiche,* for plaintiff in error.

It is clear from the pleadings filed by Lonabaugh that he is indebted to Kennedy in the sum of $2,500. There is nothing in the record showing Lonabaugh to be entitled to anything on account of the 50,000 shares of stock held by Kennedy. Whatever support there may be for the judgment dismissing the action on the ground that the contract between the parties was contrary to public policy and illegal must be found in the pleadings, or in the contract set out in the second defense and cross-petition of Kennedy. The illegality of the contract was not raised by the pleadings, nor urged by either party, and it must be conceded that the parties did not understand their contract to be in any way unlawful. Each party seems to have been willing to base his rights upon the contracts. If it could be said upon the record that Lonabaugh had entered into an agreement to procure qualified persons to make dummy entries on coal lands for the exclusive use and benefit of Holbrook and McCarthy, or some other persons, contrary to law, or this had been made to appear by the evidence, or the admission and pleadings, then there might have been a valid reason for the court to take judicial notice of such facts and enter the decree that was entered. But we do not understand that any such condition of affairs is shown by the record to have existed. On the contrary, it appears

that Lonabaugh had entered into an agreement to acquire these lands by purchase, after patent, if he could, giving Holbrook and McCarthy an option to purchase the same at a stipulated price; that in effect these plans were thereafter consummated; and such a contract does not seem to be within the inhibition of the federal statutes, or any local law, so as to make the same contrary to public policy, and therefore void. For the reason that neither of the parties have pleaded, claimed or relied upon any such construction of the contract as that placed upon it by the trial court, and no such question has been raised by anyone except the court, and that we believe that the record is not susceptible of the interpretation given to it by the trial court, we contend that the judgment should be reversed, and that Kennedy is entitled to a judgment against Lonabaugh for the sum of $2,500 claimed in his cross-petition.

. *D. C. Wenzell,* for defendant in error.

A court is bound to refuse its aid in the enforcement of a contract which is void, as in violation of law or contrary to public policy, although its invalidity may not have been specially pleaded. (Oscayan v. Arms Co., 103 U. S. 261; Morrill v. Nightingale, 27 Am. St. 207; Claflin v. U. S. Credit Co., 52 Am. St. 528.) It will therefore be conceded that if the contract and transactions shown by the evidence are contrary to law or against public policy, then the decision of the trial court in refusing relief to either party was right and the judgment should be affirmed. The government strictly enforces the limitations contained in the laws controlling the disposition of public coal lands. (U. S. v. Trinidad C. & C. Co., 137 U. S. 160; U. S. v. Keitel, 211 U. S. 370; U. S. v. Allen, 180 Fed. 855; U. S. v. Portland C. & C. Co., 173 Fed. 566.) The cases cited sustain the decision of the court that the contract and scheme of the parties to this action were contrary to law and null and void.

If, notwithstanding the cases cited, it should here be held that the transactions of these parties were not within the prohibition of the U. S. Statutes, then the defendant in

error, Lonabaugh, would be entitled to judgment as prayed for in his petition. A partner cannot stipulate for his private advantage. (Story on Partnership, (7th Ed.) Secs. 174, 175; Mechem on Agency, Secs. 454-456, 469.) When Kennedy secretly arranged for the issuance to him of 50,000 shares of the capital stock of the company which had taken over the coal lands, he placed himself in a position where he could not deal fairly with his partner.

SCOTT, JUSTICE.

This action was commenced by Lonabaugh against Kennedy for an accounting. Kennedy by way of counter claim and cross-petition sought to recover from Lonabaugh $2,500 and interest thereon from October 12, 1903. The case was tried to the court without the intervention of a jury. The court upon due consideration and of its own motion dismissed the case upon the ground "that the transaction upon which are based the claims of both plaintiff and defendant was and is contrary to public policy and illegal and can not be made a basis of recovery by either party." Both parties bring error.

It is admitted in the pleadings that in the spring of 1903 Kennedy and Lonabaugh entered into a co-partnership by which they proposed to acquire control of certain coal lands, a part of which was then patented, and a portion public coal lands, title of which was then in the United States, and interest capital in the development of the lands and the opening of a coal mine thereon, and to share equally in the profits and losses of such venture. In accordance with this agreement, 160 acres of patented land was acquired, the title being taken in Kennedy's name. Lonabaugh and his friends and relatives separately filed coal declaratory statements under the United States laws on six separate tracts of coal land, each of which contained 160 acres and aggregated 960 acres so filed on. The tract of patented land and the 960 acres so filed on was made the subject of a contract, in form an option, dated June 13, 1903, by and between Lonabaugh who signed the same individually

but acting for the co-partnership consisting of himself and Kennedy and running to Holbrook and McCarthy wherein and whereby it was stipulated and agreed that for the consideration of $5,000 in cash and the transfer to him of stock of a company to be incorporated to take over the land by Holbrook and McCarthy of the par value of $5,000, and the payment by the latter of the sum of $2,000 dollars for the 160 acres deeded land referred to as the Drombaskie tract and $100 to said Lonabaugh for the use and benefit of each and every coal claimant; $500 on or before June 20, 1903, to apply on matters connected with the option and as consideration therefor. It is admitted that final proof was thereafter made upon the lands so filed upon, that the lands were deeded to Holbrook and McCarthy, who in turn deeded them to the company which was organized by them, and that Lonabaugh received the $5,000, and 20,000 shares of stock in the corporation which was created. It is also alleged in the petition that Kennedy received 50,000 shares of the company's stock, half of which Lonabaugh claims under the contract of co-partnership between him and Kennedy, but which the latter alleges was issued to him as a bonus in connection with his salary from Holbrook and McCarthy as their superintendent in opening up the mine.

It is thus apparent that Lonabaugh bases his right to an accounting with reference to the 50,000 shares of stock issued to Kennedy on the ground that they were partnership assets growing out of their contract of co-partnership and the contract of June 13, 1903, with Holbrook and McCarthy. On Oct. 12, 1903, they made the following memorandum of agreement, to-wit:

"Memorandum of an Agreement, Made and entered into this 12th day of October, A. D. 1903, by and between E. E. Lonabaugh, the first party, and Stewart Kennedy, the second party,

WITNESSETH

Whereas, said first-party is the owner of $20,000.00 of the capital stock of the Wyoming Coal Mining Company,

a Corporation organized under the laws of the State of
Wyoming, and,

Whereas, said second party has loaned said first party
the sum of $2,500.00, for the term of two years, with in-
terest thereon at the rate of eight per cent per annum,
payable when due.

Now, therefore, in consideration of the premises, said
first party covenants, promises and agrees to and with said
second party to sell, transfer and convey unto said second
party, his heirs and assigns, within two years from this date,
$10,000.00 of the said capital stock of said Company, and
the remainder of said capital stock shall be conveyed to
said second party as collateral to said loan.

It is mutually stipulated and agreed that said first party
shall have the right or option, upon the maturity of said
indebtedness either to pay the same and redeem said stock
to the amount of said $10,000.00 or otherwise to deliver
said stock absolutely to said second party in full payment,
satisfaction and release of the said indebtedness and of all
interest thereon, and in the event that said first party elects
to surrender said stock and thereby pay said indebtedness,
said second party covenants and agrees to accept said stock
in full payment of said debt and to surrender the note rep-
resenting said indebtedness to said first party.

WITNESS the hands of the parties hereto this the day
and year first above written.

E. E. LONABAUGH,<br>
STEWART KENNEDY."

It is admitted by the pleadings that subsequent to this
agreement and in February, 1904, the shares mentioned
were issued to Lonabaugh and the $5,000 therein referred
to was paid to him as the consideration for the contract of
June 13, 1903; that the $2,500 or one-half of the cash so
paid upon the contract was never turned over to Kennedy;
that no note was ever given by Lonabaugh to Kennedy
therefor; that the agreement was an attempted adjustment
of the profits to accrue out of the contract of June 13, 1903;
that Lonabaugh never delivered to Kennedy one-half of

the stock so issued to him but did procure the company to issue to Kennedy 10,000 shares of its capital stock in lieu of one-half of the capital stock so held by him, nor did he ever assign any stock to Kennedy as collateral security for a loan nor did Kennedy loan to Lonabough $2,500, but that sum so mentioned in this memorandum of agreement was in fact Kennedy's share of the $5,000 to be paid to Lonabaugh on the contract with Holbrook and McCarthy and which was subsequently paid to Lonabaugh. The evidence tends to show, although there is a conflict in the testimony, that Lonabaugh was at the time of making the agreement ignorant of the fact that Holbrook and McCarthy had agreed to issue 50,000 shares of the capital stock of the company to Kennedy, and Lonabaugh claims that Kennedy fraudulently concealed that fact.

The contract of Lonabaugh with Holbrook and McCarthy was, we think, illegal and void as an entirety. Upon the record 160 acres included in the option was deeded land and title to the remainder, consisting of 960 acres, was then in the United States. It is all conceded to be coal land and no one otherwise qualified was authorized to enter to exceed 160 acres, but an association of such persons was authorized to enter not to exceed 320 acres of such land. (Sec. 2347 R. S. U. S.) An individual or association of persons is thus limited to the amount of coal land that can be acquired from the United States under this act. It is clear and is so held by numerous authorities that a contract similar to the one here involved constituted a conspiracy to defraud the United States of the title to its coal land and any act in furtherance of such conspiracy would constitute a criminal conspiracy and a crime within the meaning of U. S. Revised Statutes, Sec. 5440. (U. S. Comp. Stat. 1901, p. 725.) An agreement to acquire title to coal lands of the United States indirectly when it cannot be acquired directly constitutes an attempted fraud, and if the apparent title is so procured it constitutes fraud. (U. S. y. Lonabaugh, 158 Fed. 314; U. S. v. Lonabaugh, 179 Fed.

477; U. S. v. Trinidad Coal and Coke Co., 137 U. S. 160; U. S. v. Keitel, 211 U. S. 370; U. S. v. Allen, 180 Fed. 855; U. S. v. Portland Coal and Coke Co., 173 Fed. 566.) We understand that this identical contract was before the court in the Lonabaugh cases above cited and there held to be illegal and void. The contract under these authorities was and is illegal because in violation of the federal statute insofar as it affects the coal land filings and as the contract is not severable as to the Dromboskie tract it is and was illegal as a whole.

The contract being illegal there are two further questions here presented, first: Will a court of equity lend its aid to an accounting and the division of the profits of such illegal contract? and, second: If the court will not lend its aid to such accounting, is the memorandum of agreement of Oct. 12, 1903, in connection with the evidence collateral in its nature and so disconnected with the original illegal contract that a court would entertain an action thereon in favor of either party?

Neither party in the lower court sought to avoid the accounting on the ground of the illegality of the contract. It is here urged on behalf of Kennedy that the parties not having raised that question in the pleadings that it was not in issue in the case. The illegality and the nature of the contract was disclosed to the trial court by the pleadings and the evidence and for that reason it refused equitable aid to the parties in the matter of the division of the profits arising out of it. In Dunham v. Presby et al., 120 Mass. 285, an accounting was sought by one partner against another of profits resulting from an illegal trading with inhabitants of states declared in insurrection against the United States. The defendants did not set up the illegality of the transaction in their answer. The court say: "Nor is it material that the defendants do not set up the illegality in their answer, as no waiver by them or consent of parties can oblige a court to determine their rights under an illegal contract. (Cardoze v. Swift, 113 Mass. 250; Evans v.

Richardson, 3 Meriv. 469.) If the money thus received by Presby was not partnership property, in which his partners were entitled to share, of course the bill must be dismissed. If, on the other hand, as contended by the plaintiff, the money so received belonged to the partnership, to be accounted for by Presby as the profits of the joint undertaking, it is clear that it only can be reached by the plaintiff through the illegal agreement by the terms of which he is entitled to receive one-quarter part of the profits coming to the partnership from the unlawful enterprise. The case falls within the rule laid down in Armstrong v. Toler, 11 Wheat., 258, and Thomson v. Thomson, 7 Ves. 470, that no action can be maintained on such a contract to enforce its obligations or secure its fruits to either party."

In 30 Cyc., at page 356, it is said: "It makes no difference whether the contract of partnership was for the purpose of conducting an illegal business or for the conduct of a lawful business in an illegal manner for in either case the courts will refuse to recognize its existence either by enforcing its claims against others or by compelling either partner to account to the others for capital or profits in his hands or by forcing either to contribute his share of the losses to the others." Many cases are cited in the foot note in support of the text. They include partnerships formed for the purpose of conducting gambling in some form, stifling competition in the matter of bids for public works, for enhancing the price of commodities manufactured and dealt in by its members, to enhance the price of beer and stifling competition, for the performance of a contract for public works illegally procured and others not here mentioned. Wright v. Cudahy, 168 Ill. 86, 48 N. E. 39, was an action to dissolve an alleged partnership between the parties and for an accounting. No claim of the illegality of the business for which the partnership was formed was made in the pleadings. The business consisted of an attempt to corner the market and raise the price of pork contrary to the provisions of the statute. The court said:

"It is insisted, however, that as the illegality of the contract was not set up as a defense in the answer, the court could not consider the evidence on that branch of the case. The testimony adduced on the part of complainant Wright himself tended strongly to show that the contract was illegal; but even if it had not, it was not error for the court to inquire into the nature of the contract which was asked to enforce, and if it was found to be against public policy, or one prohibited by public law, to refuse to aid either party and leave them where they had placed themselves. The parties could not, whether by mistake ( design, compel the court to adjudicate upon their alleged rights growing out of a contract void because against public policy or in violation of public law, by the simple process of narrowing their pleadings. The court itself had the right to know the nature of the contract it was called upon to enforce, and to deny all relief where it appeared that such contract was in violation of law or the public policy of the state, whether so alleged in the pleadings or not. To hold otherwise would subordinate the courts to the ingenious devices of men engaged in illegal and even criminal transactions, and compel them to carry out in the solemn forms of law, and by its resistless power, transactions which the same law had pronounced criminal and void. The citation of authorities ought not to be necessary to sustain the proposition that parties cannot compel a court of equity to enforce a contract appearing by the evidence to be illegal, by the simple device or inadvertence of omitting from the pleadings the charge of such illegality. In refusing to enforce such contracts the court does not act for the benefit or for the preservation of the alleged rights of either party, but in the maintenance of its own dignity, the public good and the laws of the state. (Holman v. Johnson, Cowp. 343.) It may well be that had the trial court, under the pleadings, refused to investigate the question as to the legality of the cointract, and had found for the complain-

ants, the defendant could not have alleged such refusal as error. But that question is not presented here."

We are of the opinion that under the rule stated in these cases that it was the duty of the trial court to determine the character of the contract which it was called upon to enforce or the profits of which it was asked to distribute as disclosed by the evidence even though the illegality or its validity as being in violation of law was not raised by the pleadings. This rule seems to be universal in the absence of a statute requiring such a defense to be pleaded. (15 Am. & Eng. Ency. of Law, page 1015.)

The rule with reference to the denial of equitable relief either to enforce or divide the proceeds of such a contract as stated in the foregoing cases and Cyc. *supra,* is upheld by the great weight of authority. (15 Am. & Eng. Ency. of Law, pages 997, 1001, 1008, 1009, 1011; Bartle v. Nutt, 4 Pet. 184, 7 L. ed. 825; Wheeler v. Sage, 1 Wall. 518, 17 L. ed. 646; Boyd v. Barclay, 1 Ala. 34, 34 Am. Dec. 762; Chateau v. Singla, 114 Cal. 91, 33 L. R. A. 750, 55 Am. St. Rep. 63, 45 Pac. 1015; Miller v. Davidson, 8 Ill. 518, 44 Am. Dec. 715; Skeels v. Phillips, 54 Ill. 309; Neustadt v. Hall, 58 Ill. 172; Craft v. McConoughy, 79 Ill. 346, 22 Am. Rep. 171; Shaffner v. Pinchback, 123 Ill. 410, 23 Am. St. Rep. 624, 24 N. E. 867; Wright v. Cudahy, 168 Ill. 86, 48 N. E. 39; Smythe v. Evans, 209 Ill. 376, 70 N. E. 906; Hunter v. Pfeiffer, 108 Ind. 197, 9 N. E. 124; Barrow v. Pike, 21 La. Ann. 14; Spies v. Rosenstock, 87 Md. 14, 39 Atl. 268; Sampson v. Shaw, 101 Mass. 145, 3 Am. Rep. 327; Durant v. Rhener, 26 Minn. 326, 4 N. W. 610; Green v. Corrigan, 87 Mo. 359; Jackson v. McLean, 100 Mo. 130, 13 S. W. 393; Pendleton v. Asbury, 104 Mo. App. 723, 78 S. W. 651; Patterson's Appeal, 13 W. N. C. 154; Watson v. Fletcher, 7 Gratt. 1; Gordon v. Howden, 12 Clark & F. 237; Biggs v. Lawrence, 3 T. R. 454; Tench v. Roberts, 6 Madd. Ch. 145, note; Armstrong v. Lewis, 4 Moore & S. 1; Harris v. Amery, L. R. 1 C. P. 148; Collins v. Swindle, 6 Grant Ch. (U. C.) 282.) There are,

however, decisions to the effect that when the subject mat-
ter of an illegal contract is completed and the profits arising
therefrom have been acquired that a court of equity will
act in the matter of compelling a division of such profits
among the wrong doers upon the ground that the contract
being at an end the court by so acting does not lend its aid
to the enforcement of the illegal contract, but proceeds
upon the theory of an implied promise arising out of the
reception of the money or property which implied promise
is held to be distinct from the original illegal contract.
This rule has been applied in the following cases: Planters'
Bank v. Union Bank, 16 Wall. 483; Sharp v. Taylor, 2
Phil. Ch. 801; Burke v. Flood, 6 Sawy, 220, 1 Fed. 541;
Western U. Tel. Co. v. Union P. R. Co., 1 McCrary 628,
3 Fed. 423; Wann v. Kelly, 2 McCrary 20, 20 Fed. 167;
Crescent Ins. Co. v. Bear, 23 Fla. 50, 11 Am. St. Rep. 331,
1 So. 318; Willson v. Owen, 30 Mich. 474; Gilliam v.
Brown, 43 Miss. 641; Howe v. Jolly, 68 Miss. 323, 8 So.
513; Attaway v. Third Nat. Bank, 15 Mo. App. 577; Lewis
v. Alexander, 51 Tex. 578; McDonald v. Lund, 13 Wash.
412, 43 Pac. 348. The doctrine of implied promise where
the transaction or contract has been completed and the
profits therefrom are in the hands of one partner has been
expressly repudiated or limited in the following cases:
McMullen v. Hoffman, 174 U. S. 639, 19 Sup. Ct. Rep.
839, affirming Hoffman v. McMullen, 48 U. S. App. 596,
83 Fed. 372, 28 C. C. A. 178, 45 L. R. A. 410; Central
Trust & S. D. Co. v. Respass, 112 Ky. 606, 56 L. R. A. 497,
99 Am. St. Rep. 317, 66 S. W. 421; Snell v. Dwight, 120
Mass. 9; Dunham v. Presby, 120 Mass. 285; Morrison v.
Bennett, 20 Mont. 560, 40 L. R. A. 158, 52 Pac. 553; Todd
v. Rafferty, 30 N. J. Eq. 254; Watson v. Murray, 23 N.
J. Eq. 257; Sykes v. Beadon, L. R. 11 Ch. Div. 170.

In Sykes v. Beadon, *supra,* it is said: "It is no part of
the duty of a court of justice to aid either in carrying out
an illegal contract, or in dividing the proceeds arising from
an illegal contract." It was there held that no action could

be maintained for the one purpose more than for the other. In Planters' Bank v. Union Bank, *supra,* one of the banks sold for the other certain confederate bonds. It received the proceeds, having made the sale as agent and refused to turn over the proceeds on the ground that the original transaction was illegal. It was held that although such sale was illegal it did not constitute a defense by the agent to an action to recover such proceeds by the owner. This case is distinguishable on the principle that payment to the agent was in law payment to the principal and title vested in the latter.

In the case of Brooks v. Martin, 2 Wall. 70, the profits of an illegal partnership had been reinvested or had been made the subject of a new express promise and an accounting was compelled on the ground that such accounting could be had without reference to the illegal business out of which the money was originally made. In Chicago M. & St. P. R. Co. v. Wabash St. L. & P. R. Co., 4 Inters. Com. Rep. 578, 9 C. C. A. 659, 27 U. S. App. 1, 61 Fed. 993, which was an action to recover a share of the profits of an illegal contract by a trustee in foreclosure proceedings, the court say: "The case of Brooks v. Martin is not in point. In that case the defendant set up the illegal contract which had been fully performed and executed, as a defense upon a demand that existed independently of the contract; whereas in this case, the illegal contract is set up by the plaintiff as the foundation of its action. Strike this contract out, and confessedly the complaint states no cause of action; leave it in, and it states an illegal and void cause of action. Courts will not lend their aid to enforce the performance of a contract which is contrary to public policy, or the law of the land, but will leave the parties in the plight their own illegal action has placed them." It will be remembered that Lonabaugh bases his right to recover on an illegal partnership agreement, and the illegality of the business conducted pursuant thereto must be considered as one transaction. Brooks v. Martin is

a recognized authority showing the extent to which a court of equity will go in compelling an accounting of partnership affairs. It makes the distinction between new and independent contracts which are enforceable without reference to the original illegal business. This doctrine has been generally recognized and applied ever since the decision was made whenever the facts justified it, although it may also be said that there is an apparent conflict in the decisions as to the extent to which Brooks v. Martin goes, but the decision was limited to the facts of the case by the Supreme Court of the United States in a later case. (McMullen v. Hoffman, *supra.*)

In Morrison et al. v. Bennett, *supra,* there was an agreement between three persons to buy a mare, train her and divide equally the profits and losses. The evidence tended to show that the mare was purchased and the business of racing her carried on by the partners. By means of deception, misrepresentation and cunning they procured a party to place a wager upon a certain horse, in a race against the mare. The mare won the race and the only receipts of the partnership was the money won thereon. This money was paid to Bennett, who never gave any portion of it or accounted for it to his partners, and they brought the action for an accounting and dissolution of the partnership. At the close of plaintiff's testimony there was a motion for a non-suit upon the grounds among others that the claim upon which the suit was based was a gambling indebtedness and that the partnership was formed for illegal purposes and against public policy and good morals. This motion was denied and the trial court rendered an accounting and found in favor of the plaintiffs. Subsequently it granted a new trial from which order the plaintiffs appealed. After reviewing the evidence the court at page 570, say: "The partners evidently quarreled over the spoils and that honor pledged between the three partners seems to have been lost sight of in Bennett's greed in positively refusing to share the spoils which passed into his hands.

No court will lend its aid to assist the plaintiffs in enforcing an accounting in this acse. The very statement of the evidence proves that the object of the partners and that the methods agreed upon, and doubtless fully executed, were all dishonest, immoral, deceitful and corrupt. Men who associate themselves for the purpose of cheating others can not ask the courts to distribute their booty by adjudging the demands of one against the other arising out of their quarrels over their plunder." To the same effect is King v. Winants, 71 N. C. 472. In Todd v. Rafferty's Adm., *supra,* it was held that profits made secretly by one of two partners, in the business of the firm, is partnership property, but when obtained by the practice of fraud it can not be considered as such. In Watson v. Murray, *supra,* we quote from the syllabus as follows: "It will not avail the complainant that his suit is not to enforce an illegal contract but simply to compel an account and distribution of profits already made." In Gregory v. Wilson, 36 N. J. L. Rep. 315, 320, the plaintiff sought to recover a share of the proceeds of an illegal transaction. Chief Justice Beasley uses the following language, which was afterward quoted with approval in Todd v. Rafferty's Adm., *supra:* "Until the money, which is the wages of the ill-doing, has come into the hands of the several delinquents, the illegal transaction, so far as they are concerned, is not closed, and unless the matter has been entirely concluded by such adjudications that it would be but captiousness to dissent from them, it might well be worth consideration, whether it would not be more consistent with the usual course of the law, and more protective of public interest, to proclaim the outlawry of such affairs from the first step to the last. If A and B made sale of forged paper, and the proceeds are paid by the purchaser to A, a court of law can scarcely be said to perform either a very respectable or a useful function when it assists B in obtaining his share of the profits of the business. Nor would it seem that it should give much concern to those who dispense

public justice if one of two such delinquents should be successful in fraudulently withholding from his companion a share of the wages of the iniquity. Under such conditions the assistance of the law might, it would seem, be rightfully refused, nor for the sake of the party who thus cheated his associate in guilt, but in order to render such affairs as precarious and difficult as possible to those who might be inclined to enter upon them."

In McMullen v. Hoffman, *supra,* the Supreme Court of the United States say: "The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract. In cases of this kind the maxim is *Potier est conditio defendentis.*"

The case of Foyer v. Harken, (Iowa) 121 N. W. 526, 23 L. R. A. (N. S.) 477, is an interesting case holding that although a partnership may be void as against public policy there must have been actual fraud committed upon parties transacting business with it to preclude a member from compelling a division of the profits arising from such transactions. The partnership was organized to represent both buyer and seller in real estate transactions and it was held that parties who were cognizant of that fact and consented thereto and who dealt with the partnership were not defrauded and that a division of the commissions arising from such transactions would be compelled by the court. That case is distinguishable from the one before this court for there a part of the business transacted was legal and a part tainted with fraud. The court recognized the partnership insofar as it transacted a business that was legal, and refused to recognize it in those transactions where the interested parties were ignorant of and did not consent to the firm representing both seller and buyer. The court say:

"Conceding, then, that the partnership was, insofar as: it contemplated the representation by the firm of both sides of a real estate transaction, illegal or contrary to public policy, still this illegality would not affect transactions when the firm represented but one side and earned its commission lawfully. As to this, defendant can not be heard to say that because it conducted other illegal transactions, he will withhold from plaintiff his share of the money lawfully and properly earned." The court cites in support of this proposition Anderson v. Powell, 44 Iowa, 20; Central Trust & S. D. Co. v. Respass, *supra*, Leekins v. Nordyke, 66 Iowa, 471, 24 N. W. 1. The court further say: "It is a well known rule of agency that an agent can not represent both parties—can not serve two masters. But this rule is for the protection of the principals, and not for the benefit of the general public. If the principals agree to it, that is the end of the transaction. The partnership, viewed in its worst aspect, was not to defraud the public generally, but to take advantage of prospective customers who might or might not consent. Without consent, commissions could not be collected from either party, but with it they could be collected from both." This decision is in accord with the established rule that it is the duty of a court to sustain a contract or part of it whenever it can do so within the provisions of the law and good conscience. We think this case upon the facts is in harmony with the great weight of authority. It is an instructive case and also valuable for its annotations.

McMullen v. Hoffman, *supra*, was an action for a division of the profits of an illegal contract, commenced in the U. S. Circuit Court of Oregon. Pending the suit, Hoffman, the defendant, died and the suit was revived against Julia E. Hoffman, executrix of the last will and testament of the deceased. The circuit court by its decree sustained the partnership and decreed an accounting, from which part of the decree the defendant appealed. The court also allowed the managing partner his salary but refused to

allow interest and costs, from which part of the decree the plaintiff appealed. (75 Fed. Rep. 547.) The judgment and decree was reversed by the U. S. Circuit Court of Appeals, Ninth Circuit, Hoffman v. McMullen, *supra,* and from the judgment of reversal the case was taken to the Supreme Court of the United States by *certiorari.* (McMullen v. Hoffman, *supra.*) There was an agreement between Hoffman and McMullen by the terms of which they were to put in bids for the construction of work for the City of Portland, and, quoting from the last opinion, "the bids should not be in reality competitive, but should be submitted to each other before they were put in and their terms should be mutually agreed upon, the higher bids to be merely formal, and the bids themselves as agreed upon should be delivered * * * that if either party received the contract they should both share in the profit or loss resulting from its performance, but that their material interest in each other's bids should not be made known when the bids were offered, so that it would appear that they were apparently competing for the various classes of the work and for furnishing the material, when in fact they were not. This agreement the defendant alleged was carried out, and the contract secured by means thereof." While the facts differ from the case here presented, yet it is a leading case upon the question we are considering. The Supreme Court of the United States, among others, reviews the following cases, *viz:* Tennant v. Elliott (1747), 1 Bos. & Pul. 2; Farmer v. Russell (1798), 1 Bos. & Pul. 295; Booth v. Hogson, 6 T. R. 405, 408; Thomson v. Thomson, 7 Ves. 468; Sharp v. Taylor (1849), *supra;* Armstrong v. Toler (1826), 11 Wheat. 258, 269; McBlair v. Gibbes, *supra,* 17 Howard, 232, 235; Brooks v. Martin (1863), 2 Wall. 70; Planters' Bank v. Union Bank, *supra;* Embry v. Jamison, 131 U. S. 336, 348; Armstrong v. Am. Ex. Nat. Bank of Chicago (1889), 133 U. S. 433, 466.

In Thomson v. Thomson, *supra,* and Embry v. Jamison, *supra,* the plaintiff was not permitted to recover because he

could not do so except through the medium of an illegal agreement. In Tenant v. Elliott, *supra,* and Farmer v. Russell, *supra,* the loss upon an illegal insurance policy was paid to a third person for the benefit of the insured, and it was held that the illegality of the contract was no defense to an action by the insured to recover the money in the hands of such third person. In Sharp v. Taylor, *supra,* one of the partners had possessed himself of the property of the firm, consisting of profits and the proceeds of the sale of a ship used in freighting, and refused to account with his partner on the ground that in realizing the profits a provision of a foreign statute and also of an act of parliament relating to the registry of vessels had not been complied with. There was no proof of the foreign statute. It was held upon the facts of that case that the alleged illegality did not constitute a defense for an accounting for profits by one party against the other. Judgment for the plaintiff was given upon the grounds, first: That independent of the act of parliament the importation of goods from the foreign state in a ship built therein and not professing to have been registered in England would not be illegal,—a phase of the case which was not covered by the evidence—and, second, that the violation of the law regulating navigation and freight, did not constitute a defense. The partnership was not organized to carry on an illegal business, or to violate the law. It is apparent that at least insofar as the proceeds of the sale of the ship were concerned that such proceeds were legally the property of the firm. The case has been much criticized as an accounting was allowed for all the profits, the court holding that the violation of the navigation laws did not constitute a defense to an accounting for all. Insofar as the court rested its opinion on the second ground it seems to have been unnecessary to a decision of the case. In McBlair v. Gibbes, *supra,* one's interest in an illegal contract was assigned in consideration of the relinquishment of a debt, payment of the money arising from the contract was provided for after

the assignment, and the dispute was between the representatives of the assignor and representatives of the assignee as to which was entitled to the fund. The former claimed the fund on the ground that the assignment was of the profits of an illegal contract and for that reason void. The court upon the facts dismissed the case upon the ground that although the illegality of the contract might have been set up as a defense to an action thereon, yet that having been waived and provision for payment of the contract price to the assignee having been made it can not thereafter be recovered. Armstrong v. Toler, *supra,* was an action upon a subsequent independent contract founded on a new consideration and not contaminated by the preceding illegal contract. In Armstrong v. Am. Ex. National Bank of Chicago, *supra,* it is held that when losses have been made in an illegal transaction, one who knowingly lends money to the loser with which to pay the losses can recover the loan as the latter rests upon an independent consideration and the plaintiff does not require the aid of the illegal transaction to make out his case.

It will be observed that none of these cases when recovery was permitted called for the enforcement of the original illegal contract, nor did the parties have to resort thereto. Such recovery was allowed upon collateral contracts, based upon new considerations or when a third party not connected with the illegal contract or transaction had received the profits of such illegal contract or transaction upon a promise impliedly or expressly to pay. The court limits its discussion in McMullen v. Hoffman, *supra,* and say: "It is impossible to refer to all the cases cited from the various state courts regarding this question. Some of them we should hesitate to follow. The cases we have commented upon we think give no support for the claim that the case now before us forms any exception to the rule which, as we believe, clearly embraces it. We must take the whole agreement, and remember that the action is between the original parties to it; that there is no collateral

contract and no new consideration and no liability of a third party. The partnership is but a portion of the whole agreement.

"We must, therefore, come back to the proposition that to permit a recovery in this case is in substance to enforce an illegal contract, and one which is illegal because it is against public policy to permit it to stand. The court refuses to enforce such a contract and it permits defendant to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest. It has been often stated in similar cases that the defense is a very dishonest one, and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public considerations and in order the better to secure the public against dishonest transactions. To refuse to grant either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly towards reducing the number of such transactions to a minimum. The more plainly parties understand that when they enter into contracts of this nature they place themselves outside the protection of the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be to enter into them. In that way the public secures the benefit of a rigid adherence to the law.

"Being of the opinion that the contract proved in this case was illegal in the sense that it was fraudulent, and entered into for improper purposes, the law will leave the parties as it finds them."

In Snell v. Dwight, 120 Mass. 9, it was held, quoting from the syllabus, that "a bill in equity can not be sustained by one of the parties to a contract for illegal trading with inhabitants of states declared in insurrection against the United States government, against another party to such contract, for an account of resulting profits." The court say: "The cases of Brooks v. Martin, 2 Wall. 70, and Sharp v. Taylor, 2 Phil. Ch. 801, upon which case Brooks v. Martin rests as its principal authority, relate to subse-

quent or collateral contracts and transactions, in which the original illegal acts and contracts are held to form no part of the consideration." As already stated, the contract was void as being in violation of the statute of the United States. It is to carry out the provisions of the contract of partnership that this action is brought, *viz:* to divide the profits of the illegal contract of June 13, 1903, share and share alike in pursuance of the partnership agreement. To grant the relief prayed would enforce the contract, for the latter and the partnership agreement must be considered together as one transaction. (McMullen v. Hoffman, *supra.*) "There is nothing collateral in respect of which the contract being out of the question, a collateral demand arises." (Snell v. Dwight, *supra.*) In Gray v. Hook, 4 N. Y. 499, the court say: "The distinction between a void and valid new contract in relation to the subject matter of a former illegal one depends upon the fact whether the new contract seeks to carry out or enforce any of the unexecuted provisions of the former contract, or whether it was based upon a moral obligation growing out of the execution of an agreement which could not be enforced by law, and on the performance of which the law will raise no implied promise. In the first class of cases, no change of the form of a contract will avoid the illegality of the first consideration, while express promises based upon the last class of considerations may be sustained." This rule was reaffirmed in Woodworth v. Bennett, 43 N. Y. 273, 3 Am. Rep. 706, and quoted with approval in Morrison v. Bennett, *supra.* In Hoffman v. McMullen, *supra,* Judge Hawley, speaking for the Court of Appeals, says: "The distinction between the cases where a recovery can be had and the cases where a recovery can not be had of money connected with illegal transactions, to be gleaned from all the authorities, is substantially this: That whenever the party seeking to recover is obliged to make out his case by showing the illegal contract or transaction, or through the medium of the illegal contract or transaction, or when

it appears that he was privy to the original illegal contract or transaction, then he is not entitled to recover any advance made by him in connection with that contract or money due him as profits derived from the contract; but when the advances have been made upon a new contract, remotely connected with the original illegal contract or transaction, and the title or right of the party to recover is not dependent upon that contract, and his case may be proved without reference to it, then he is entitled to recover." (16 A. & E. Ency. of Law, 993 and cases there cited.)

Applying the law here announced it is apparent that Lonabaugh cannot maintain his action against Kennedy for a share in the 50,000 shares of the capital stock of the coal company on the ground that it was received as a part consideration of the illegal contract. Nor can Kennedy recover on his cross bill the $2,500 mentioned in and by reason of the so-called adjustment or memorandum of agreement dated Oct. 12, 1903, set out in the former part of this opinion, for the evidence shows that this was a part of the prospective proceeds of the illegal contract and Lonabaugh, although he received it at a subsequent date, refused to pay it. This agreement was in form an acknowledgment of indebtedness, although, as shown by parol evidence, for the purpose of the disposition between the partners of an illegal partnership of the profits of an illegal contract when possession of such profits should come into the hands of one of the partners. It will be observed that in an action to recover this $2,500, if Kennedy were put on his proof as to the consideration for the promise to pay that sum he would have to disclose how and in what manner Lonabaugh became indebted to him. It was not an account stated for there was then no funds in the hands of Lonabaugh belonging to the firm or to Kennedy and the latter had made no loan. It was not a collateral agreement that could be enforced independent of the original illegal contract. In this case Kennedy based his right to recover upon the fact,

and so testified, that it was a part of the prospective profits of the contract which the lower court properly held to be illegal. True, Lonabaugh acknowledged the indebtedness in this agreement but it was based on no new consideration, nor did it represent anything of value in his hands which in good conscience belonged to Kennedy. (Embry v. Jamison, *supra*.) It grew immediately out of and was connected with that contract and its illegality as well as that of the partnership agreement entered into the adjustment and rendered it illegal. (15 A. & E. Ency. of Law, p. 992.)

We have not deemed it necessary to prolong this discussion by referring further to specific cases. Indeed, to do so would render this opinion unnecessarily long. It is sufficient that the better reasoning and the great weight of authority condemns the doctrine of implied promise in the matter of the division of the profits of an illegal contract between the partners or joint contractors, as a ground for equitable relief and this being a question of first impression we are of the opinion that that doctrine ought not to find a foothold in this jurisdiction. It is a principle which controls courts of equity in the administration of justice that he who seeks their aid must do so with clean hands—that he can not make his iniquitous act the basis of equitable relief. To decree a division of the profits of this contract would be in substance to enforce an illegal contract. (McMullen v. Hoffman, *supra*.) The lower court properly left the parties where they had placed themselves.

The judgment will be affirmed, each party to pay his own costs in this court.

*Affirmed.*

BEARD, C. J., and POTTER, J., concur.